**CONTINENTAL TERMINALS, INC., Plaintiff, Counterclaim-Defendant,**

v.

**The WATERFRONT COMMISSION OF NEW YORK HARBOR, Defendant, Counterclaim-Plaintiff.**

**No. 79 Civ. 1498(RWS).**

United States District Court, S. D. New York.

Feb. 21, 1980.

---

Jaffe, Shaw & Rosenberg, New York City, for Continental Terminals, Inc. by Arnold Shaw, New York City, of counsel.

Ellen J. Bronzo, New York City, for Waterfront Commission of New York Harbor.

## OPINION

SWEET, District Judge.

Continental filed this action on March 21, 1979, seeking a declaration that it is not required to be licensed as a stevedore and that its employees are not required to be registered under the Waterfront Commission Act (the "Act"), N.Y.Unconsol.Laws, §§ 9801 *et seq.*; N.J.Stat.Ann. §§ 32:23–1 *et seq.*; Pub.L. No. 252, Ch. 407, 67 Stat. 541 (1953). Continental also seeks permanently to enjoin the Commission from requiring such registration and licensure. The Commission has filed a counterclaim for a declaration that Continental is performing services which require it to be licensed as a stevedore under the Act and that its employees must be registered or licensed in accordance with the Act. The Commission also seeks injunctive relief, money damages, and assessments to support costs of administration which it claims Continental owes.

Continental and the Commission have now cross-moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The pertinent facts are undisputed. The principal issue in the action is whether Continental's warehousing operations take place on a pier as that term is defined in the Act. The court has discovered that what appears to be a pier in concept becomes less apparent when reduced to prose. However difficult the task has been, the court is convinced that Continental's warehousing operations do take place "on a pier" and that Conti-

nental is a stevedore under the Act. Continental's motion is denied and the Commission's motion is granted.

◼ At a hearing on the motion in this case, the court raised the issue of subject matter jurisdiction. Both parties contend that the interpretation of the Act presents a question of federal statutory interpretation, and that jurisdiction is conferred under 28 U.S.C. § 1337.

The Commission is a bi-state agency formed pursuant to a compact between New York and New Jersey in 1953, authorized by Congress in accordance with its power under Article I, Section 10, Clause 3 of the United States Constitution. The jurisdictional issue, one which has never been decided by the Second Circuit, is whether a case involving construction of a bi-state compact is a case "arising under any Act of Congress regulating commerce." 28 U.S.C. § 1337.

In *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), an employee of a congressionally-approved bi-state commission was killed while working on a ferryboat on the Mississippi River. His widow filed an action against the Commission under the Jones Act, 46 U.S.C. § 688. Although jurisdiction existed under that Act, the Supreme Court stated in dictum:

The construction of a compact sanctioned by Congress under Art. I, § 10, cl. 3, of the Constitution presents a federal question. . . . Moreover, the meaning of a compact is a question on which this Court has final say. . . . [W]here the waiver is, as here, claimed to arise from a compact between several States, the Court is called on to interpret not unilateral state action but the terms of a consensual agreement, the meaning of which, because made by different States acting under the Constitution and with congressional approval, is a question of federal law. . . . In making that interpretation we must treat the compact as a living interstate agreement which performs high functions in our federal-

ism, including the operation of vast interstate enterprises.

*Id.* at 278–79, 79 S.Ct. at 788 (citations and footnotes omitted).

Although subsequent cases have cast some doubt on the sweeping language of the Court in *Petty*,[1] the courts have generally held that interpretation of state statutes implementing a compact presents a federal question. *Trotman v. Palisades Interstate Park Commission*, 557 F.2d 35 (2d Cir. 1977); *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 507 F.2d 517 (9th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); *Walker v. King*, 448 F.Supp. 580 (S.D.N.Y. 1978). In *Lake Tahoe* the court held that the federal courts had subject matter jurisdiction over a suit alleging that defendant, an agency established pursuant to a bi-state compact, had failed to comply with the legal requirements of the compact. In examining whether federal jurisdiction existed, the court took into account the degree to which Congress had scrutinized the need for the particular agency and the importance of uniformity of interpretation of the compact. *See also Trotman v. Palisades Interstate Park Commission, supra; Walker v. King, supra; New York Shipping Assoc., Inc. v. Waterfront Commission of New York Harbor*, No. 78–995 (D.N.J. June 1, 1978); *Federal Question Jurisdiction to Interpret Interstate Compacts*, 65 Geo.L.J. 87 (1975).

In this case, the consent of Congress to the Act was not perfunctory. Congress independently investigated the evils that necessitated a bi-state agency. *DeVeau v. Braisted*, 363 U.S. 144, 149, 80 S.Ct. 1146, 1149, 4 L.Ed.2d 1109 (1960). Moreover, uniform construction of the Act is essential to prevent inconsistent enforcement of its requirements in New York and New Jersey. For example it would be inequitable to impose on a New York warehouseman the economic burdens associated with being a "stevedore," and not impose those burdens on a New Jersey warehouseman doing substantially the same business.

For the reasons stated, this court has subject matter jurisdiction to decide the merits of this case and provide appropriate relief.

■ The principal issue in this case is whether warehousing activities carried on by Continental bring it within the definition of "stevedore" in the Act. Stevedores are defined in the Act as:

> contractors (not including employees) engaged for compensation pursuant to a contract or arrangement with any person to perform labor or services incidental to the movement of waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, including, but not limited to, cargo storage, cargo repairing, coopering, general maintenance, mechanical or miscellaneous work . .

N.Y.Unconsol.Laws § 9905(1)(b); N.J.Stat. Ann. § 32:23–85(1)(b). Waterborne freight is defined in the Act as:

> freight which has been, or will be, carried by or consigned for carriage by a carrier of freight by water.

N.Y.Unconsol.Laws § 9905(10); N.J.Stat. Ann. § 32:23–85(10). "Pier" is defined in the Act to "include any wharf, pier, dock or quay." N.Y.Unconsol.Laws § 9806; N.J. Stat.Ann. § 32:23–6.

Under these definitions Continental qualifies as a stevedore if it is both: (1) engaged for compensation pursuant to a contract or arrangement with any person to perform labor or services incidental to the movement of waterborne freight; and (2) performing such a contract or arrangement on a pier. Continental meets both branches of this definition and accordingly is a stevedore under the Act.

The nature of Continental's warehousing activities is essentially undisputed. Continental operates warehouse facilities at four

---

1. *See Port Authority Bondholders Pro. Comm. v. Port of New York Authority*, 387 F.2d 259 (2d Cir. 1967); *National Cold Storage Co. v. Port of New York Authority*, 286 F.Supp. 1016 (S.D.N.Y.1968); *see also Rivoli Trucking Corp. v. American Export Lines, Inc.*, 167 F.Supp. 937 (E.D.N.Y.1958).

buildings located on the north bank of the Gowanus Canal in Brooklyn and on the south side of Smith Street. There is no body of water to the north of Smith Street. Continental owns three of the buildings, known as buildings C, E and J, and rents a fourth, building D, from Bayway Building Corp. ("Bayway"). There is a bulkhead or "stringpiece" along the canal. The area bounded by the warehouses on the north and by the Gowanus Canal on the south is known as the "farm area," and is used for unloading and sorting cargo. Bayway owns the farm area and stringpiece located between the building it leases to Continental and the canal, and does not lease this farm area and stringpiece to Continental. Continental owns the stringpieces and farm areas adjacent to the buildings it owns. A map of the area is attached as Appendix A.

Although the stringpiece runs along the farm area in front of all four buildings, the only portion of the stringpiece which is currently in use lies in front of building C, owned by Continental, and the building and farm area owned by Bayway. No ships dock and no cargo is unloaded at those sections of the bulkhead and farm area in front of buildings E and J.

The ships which dock along the Smith Street Dock are unloaded by longshoremen employed by licensed stevedores. The longshoremen deliver the goods to the doorsteps of all four buildings, and not only to the building leased to Continental by Bayway. Employees of Continental then transport the goods into the buildings, where they are stored. Freight arriving by water comprises approximately ten percent of the goods warehoused by Continental at those facilities. The balance arrives by truck.

The merchandise arriving in Continental's terminals by ship is "waterborne freight" since it is "freight which has been . . . carried by . . . a carrier of freight by water." Continental stores these goods as bailee for the shipper-owners. Since "cargo storage" is one of the functions expressly defined as a "stevedoring activity" in the Act, the warehousing services provided by Continental are "incidental to the movement of waterborne freight."

Continental's status as a stevedore under the Act turns on whether the warehouses that it operates are located "on a pier."

■ Continental concedes that the portion of the stringpiece at which ships actually tie up is a "pier" for purposes of the Act. The definition of "pier" in the Act is not restricted to structures bounded on three sides by water, but expressly includes "any wharf, pier, dock or quay." The Oxford English Dictionary defines "quay" as "an artificial bank or landing-place, . . . lying along or projecting into a navigable water for convenience of loading and unloading vessels." The same source contains the following definition of "wharf": "[a] . . . structure . . . built along the water's edge, so that ships may lie alongside for loading and unloading." It is noteworthy that the United States Army Corps of Engineers includes the "Smith Street Dock" as one of the functioning piers in New York harbor. *U. S. Army Corps of Engineers, The Port of New York, N. Y. and N. J.* (1978). The mere fact that the dock is bounded on the north by land does not prevent it from qualifying as a pier under the Act.

Continental's argument that its warehouses are not located on a pier is two-pronged. First, Continental claims that the "pier" encompasses only the stringpiece along the canal and that the warehouse buildings are too far removed from the unloading site to be considered part of the pier. Second, it urges that the "pier" includes only that portion of the stringpiece at which ships actually dock. Since no ships tie up at the stringpiece owned by Continental, its operations at these three buildings do not take place on the pier.[2]

---

2. Continental concedes that some ships dock along the stringpiece in front of building C, one of the buildings it owns, as well as along the stringpiece in front of building D, the building owned by Bayway. It argues that use of the "building C" stringpiece is only "accessorial," and does not result in any docking fees, and therefore this portion of the stringpiece is not a "pier."

Although these arguments are not without merit, Continental's position as to what constitutes the pier is excessively restrictive. The first argument, that the pier is limited to the stringpiece, would render the definition of "stevedore" meaningless, since it would be impossible to perform the activities enumerated in that definition on the stringpiece itself. The warehouses operated by Continental closely abut the canal and are directly contiguous to the loading areas. Moreover, it would appear that all the cargo unloaded at the Smith Street Dock is stored at one of the warehouses operated by Continental. Under these circumstances, it would defeat the purpose of the Act to interpret the term "pier" to exclude Continental's warehouses.

Continental's second argument, that its warehouses are not on a pier because no ships tie up at the stringpiece next to the buildings it owns, must also be rejected. It is true that the definition of "quay" and "wharf" quoted above could be interpreted to include only that segment of a landing place alongside which ships actually sit for loading and unloading, so that only building "C" and building "D," the building leased from Bayway, would be "on a pier." However, the main cargo entrance to building E faces directly onto the farm area onto which waterborne freight is discharged from ships. Furthermore, a substantial proportion of the freight received at Continental's warehouse facilities, approximately ten percent, arrives by sea.

Any determination as to the extent of the pier necessarily involves some arbitrary line-drawing. If Continental's warehouses were located on the north side of Smith Street, rather than adjacent to the Gowanus Canal, the court would be reluctant to view them as "on a pier." Similarly, despite the juxtaposition of the buildings to the dock, no application of the Act would be appropriate in the absence of waterfront activity. In this regard, it should be noted that the Commission investigated the Smith Street Dock in 1972, and found that it was not being used for loading and unloading vessels. It was not until 1978, when the Commission learned of cargo operations being conducted at the pier, that it sought to apply the Act to Continental.

▇ In reaching the conclusion that Continental's activities render it a stevedore within the meaning of the Act, it is also significant that the Act is designed as a remedial measure to combat waterfront crime in New York harbor. To achieve this goal, the Commission has been granted broad supervisory, investigatory and regulatory powers. In view of the proximity of Continental's warehouse to the unloading operations and the significant reliance of Continental's activities on the arrival of waterborne freight there, it would defeat the corrective goals of the Act to exclude the warehouses from the coverage of the Act.

▇ Since Continental's warehouse operations are incidental to the transportation of waterborne freight and occur on a pier, Continental fits the definition of "stevedore" under the Act, and is subject to licensure by the Commission.

The Commission requests four forms of relief: (1) a declaratory judgment, (2) a permanent injunction, (3) money damages, and (4) assessments owed which are applicable to costs of administration of the Waterfront Commission.

The activity carried on by Continental brings it within the definition of "stevedore." Declaratory judgment pursuant to 28 U.S.C. § 2201 to that effect is granted. *Compare Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975); *Diematic Mfg. Corp. v. Packaging Industries, Inc.*, 412 F.Supp. 1367 (S.D.N.Y. 1976).

▇ The Act permits the Commission to obtain an injunction to ensure compliance

with its orders. N.Y.Unconsol.Laws § 9910; N.J.Stat.Ann. § 32:23–90. Although there is no evidence that Continental will flout the judgment of this court, an injunction will be ordered against Continental's continued operation as a stevedore until it complies with the Commission's January 27, 1978 order directing it to file for a stevedoring license. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949 (2d Cir. 1978); *SEC v. Everest Management Corp.*, 466 F.Supp. 167 (S.D.N.Y.1979).

■ In addition to declaratory and injunctive relief, the Commission seeks to recover the assessments that Continental would have paid had it been properly licensed from February 10, 1978 to the present. N.Y.Unconsol.Laws § 9858; N.J. Stat.Ann. § 32:23–58. *See Rothstein v. Wyman*, 357 F.Supp. 1057 (S.D.N.Y.1972).

The court agrees that such backpayments are appropriate. However, the parties have submitted no evidence as to the amount of back assessments. The parties will have until March 10, 1980 to agree upon the amount of such assessments owed by Continental. In the absence of such an agreement, this issue will be referred to a magistrate.

■ Finally, the Commission has sued to impose a $500 fine for each day for which Continental has operated without a stevedore's license. Although the Act authorizes the Commission to maintain a civil action for such damages, N.Y.Unconsol.Laws § 9909; N.J.Stat.Ann. § 32:23–89, it specifically provides that a court may grant judgment "for an amount less than the amount demanded in the complaint as justice may require." In this case justice requires that the $500 daily fine be dispensed with. There is no evidence that Continental has willfully attempted to evade the Commission's authority; rather it appears that Continental has litigated in good faith a significant issue concerning the coverage of the Act. It would be unfair to penalize Continental for seeking resolution of this issue in court.

IT IS SO ORDERED: