WATERFRONT COMMISSION OF NEW YORK HARBOR, ON BE-
HALF OF ITSELF AND OF THE STATE OF NEW JERSEY,
PLAINTIFF-APPELLANT, v. MERCEDES–BENZ OF NORTH
AMERICA, INC., DEFENDANT-RESPONDENT.

Argued February 20, 1985—Decided June 4, 1985.

*David B. Greenfield,* Assistant Counsel, argued the cause for appellant (*Gerald P. Lally,* General Counsel, attorney).

*Jeffrey C. Poll* argued the cause for respondent (*Allan G. Freund,* attorney).

The opinion of the Court was delivered by

STEIN, J.

This case concerns the jurisdiction of the Waterfront Commission of New York Harbor (Waterfront Commission or Commission) over certain workers employed by defendant, Mercedes-Benz of North America, Inc. (Mercedes-Benz or Mercedes), at its automobile-preparation facility in Port Newark. The Chancery Division ruled that these employees were not longshoremen or hiring agents subject to registration or licensing under

the Waterfront Commission Act, *N.J.S.A.* 32:23-1 to -225,[1] and the Appellate Division affirmed. We granted certification on the petition of the Waterfront Commission. 97 *N.J.* 702 (1984).

I

The Waterfront Commission brought this action to enjoin Mercedes-Benz from violating the Waterfront Commission Compact (the Act), an interstate agreement entered into by the States of New Jersey and New York with the consent of Congress. *L.*1953, *chs.* 202 and 203; 1953 *N.Y.Laws* 2417 and 2443, *chs.* 882 and 883; Act of August 12, 1953, Pub.L. No. 252, c. 407, 67 Stat. 541. Plaintiff alleges that certain employees at Mercedes' former vehicle preparation facility in Port Newark [2] were either not registered as longshoremen, in violation of *N.J.S.A.* 32:23-27, or not licensed as hiring agents, in violation of *N.J.S.A.* 32:23-12. The Commission sought to recover from Mercedes payroll assessments [3] with interest and penalties pursuant to *N.J.S.A.* 32:23-58 and -74(8), as well as statutory civil penalties for violating the Compact pursuant to *N.J.S.A.* 32:23-89.

---

[1]Congress has not given its consent to *N.J.S.A.* 32:23-150 to -225. Consequently, these provisions are not yet in effect. *N.J.S.A.* 32:23-225.

[2]Mercedes-Benz moved its vehicle preparation facility out of New Jersey in September, 1983. The Appellate Division denied Mercedes' motion to dismiss the Commission's appeal as moot, because the Commission pressed its claim for past assessments and penalties.

[3]That portion of the Commission's budget that is not funded from reserves, federal grants, or other sources is derived from assessments against employers of persons registered or licensed under the Act. These assessments are based upon the gross payroll payments such an employer makes to its registered and licensed employees and may not exceed 2% of this payroll. *N.J.S.A.* 32:23-58. The amount in dispute in this case does not appear in the record. At oral argument, the parties indicated that the calculation of any assessments, interest, and penalties due was to await the trial court's determination whether or not the Waterfront Commission had jurisdiction over the employees in question. Because the trial court ruled that the Commission had no jurisdiction, the amount in issue was never determined.

From 1968 until September, 1983 Mercedes leased Building 250 in Port Newark from the Port Authority of New York and New Jersey. Mercedes used this facility for vehicle storage and preparation work on the luxury automobiles it imported by ocean carrier from West Germany. The work performed at Building 250 included removal of the cosmoline coating that protected the vehicles during shipment, inspection for body damage, checks of fluid levels, monitoring the numerous mechanical and electrical systems, and verification that the vehicles met both company and governmental standards. Any deficiencies were remedied by Mercedes employees before delivery of the vehicles to dealers. The Commission did not assert jurisdiction as to other work performed at this facility, such as repair of "company" cars and cars under warranty, and modification of automobiles purchased in West Germany for use in the United States.

The Mercedes employees who performed this work were hired on a permanent basis and were members of a warehouse local of the International Longshoremen's Association. Many of these employees were highly trained and their jobs required the use of specialized tools, testing devices, and equipment. The Commission produced evidence that it had required the registration of the employees of a number of independent firms that provided similar automobile preparation services for cars imported by other automobile companies.[4]

The Commission contended that those Mercedes employees who removed the protective coating from the vehicles, inspected for and repaired damage sustained during ocean shipment, or who were involved in the storage of the vehicles were "long-

---

[4]Mercedes would distinguish its activities from those performed by these independent companies because these other companies lacked sophisticated equipment and could not render repairs and servicing of a quality comparable to that provided by Mercedes for its own cars. Mercedes argued that its operation was in reality a continuation of the manufacturing process and that all repairs done at the facility used sophisticated factory techniques to ensure a vehicle's total compliance with Mercedes' high factory standards.

shoremen" within the meaning of the Act, *N.J.S.A.* 32:23–85(6), and that the persons who hired them were "hiring agents" as defined in *N.J.S.A.* 32:23–85(9).[5] The Commission's claim that these employees were subject to registration, licensing, and payroll assessments hinges on the interpretation of the statutory term "longshoreman." *N.J.S.A.* 32:23–85(6) defines "longshoreman" as follows:

> (6) "Longshoreman" shall also include a natural person, other than a hiring agent, who is employed for *work at a pier or other waterfront terminal*
>
> (a) either by a carrier of freight by water or by a stevedore physically to perform labor or services incidental to the movement of waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, including, but not limited to, cargo repairmen, coopers, general maintenance men, mechanical and miscellaneous workers, horse and cattle fitters, grain ceilers and marine carpenters, or
>
> (b) by any person physically to move waterborne freight to or from a barge, lighter or railroad car for transfer to or from a vessel of a carrier of freight by water which is, shall be, or shall have been berthed at the same pier or other waterfront terminal, or
>
> (c) by any person to perform labor or services involving, or incidental to, the movement of freight at a waterfront terminal as defined in subdivision (10) of this section. [Emphasis added.]

The Chancery Division focused on the prefatory language of paragraph (6) and on subparagraph (c), the subparagraph upon which the Commission's claim was based. The court observed that in order to satisfy the statutory definition of longshoreman, the Mercedes employees had to work at a pier or other waterfront terminal and their work had to involve or be incidental to the movement of freight. The court reasoned that the status of the designated Mercedes employees as longshoremen depended upon the meaning to be given to the statutory term "freight." Not only does the statute require that the work performed be incidental to the movement of freight, but the requisite location of the work, the "other waterfront terminal,"

---

[5]*N.J.S.A.* 32:23–85(9) defines hiring agent as "any natural person, who on behalf of any other person shall select any longshoreman for employment."

is partly defined in terms of its use as an area for work incidental to or involving the movement of freight.[6]

The Act defines freight tautologically: " 'freight' means freight which has been or will be, carried by or consigned for carriage by a carrier of freight by water * * *." *N.J.S.A.* 32:23–85(10). Conceding that the Mercedes vehicles "ha[d] been carried by a carrier of freight by water," the trial court concluded that the vehicles were "freight" only when they were being "handled by people as part of a transportation service rendered for pay to [Mercedes]" but that they ceased to be freight when they came into Mercedes' possession at Building 250. Accordingly, the trial court found none of the Mercedes employees to be longshoremen or hiring agents within the meaning of the Act. This decision was affirmed by the Appellate Division.

## II

A thorough understanding of the statutory terms crucial to the resolution of this case is afforded by reference to the

---

[6]*N.J.S.A.* 32:23–85(10) defines "other waterfront terminal" as

> any warehouse, depot or other terminal (other than a pier), whether enclosed or open, which is located in a marine terminal in the Port of New York District and *any part of which is used by any person to perform labor or services involving, or incidental to, the movement of waterborne freight or freight.* [Emphasis added.]

This same statutory provision defines "marine terminal" as "an area which includes piers, which is used primarily for the moving, warehousing, distributing or packing of waterborne freight or freight to or from such piers, and which, inclusive of such piers, is under common ownership or control." *N.J.S.A.* 32:23–85(10).

The court found that Building 250 was situated in the Port of New York District and was located in a marine terminal because it was situated in an area used primarily for warehousing and distributing waterborne freight from piers that were located in that area, and that the entire area, including the piers, was under the common control of the Port Authority of New York and New Jersey. Thus, the only remaining issue was the nature of the work done at the facility; if any of the work either involved, or was "incidental to, the movement of waterborne freight or freight," then the location where the work was performed would constitute a waterfront terminal.

history of the Waterfront Commission Act and its amendments. The original Act was passed in 1953 by the States of New Jersey and New York as an interstate compact with congressional consent. *L.*1953, *chs.* 202 and 203 (codified at *N.J.S.A.* 32:23–1 *et seq.*); 1953 *N.Y.Laws* 2417 and 2443, *chs.* 882 and 883, N.Y.Unconsol.Laws § 9801 *et seq.* (McKinney 1974, Supp. 1984–85); Act of August 12, 1953, Pub.L. No. 252, c. 407, 67 Stat. 541. This Court has previously emphasized that the primary purpose of this bistate legislation was the elimination of corruption on the waterfront in the Port of New York Harbor. In *Hazelton v. Murray,* 21 *N.J.* 115, 120 (1956), we noted the existence of a serious threat to the supremacy and economic well-being of New York Harbor:

> This threat lay in the fact that criminals, racketeers and hoodlums had acquired a stranglehold upon port activities through their control of key positions in a large number of the 64 locals of the International Longshoremen's Association (eleven of the locals were New Jersey locals), which numbered in its membership not alone the longshoremen but as well the pier superintendents and hiring agents who employed and supervised their work * * *.

> The public hearings on the *New York Crime Commission's Fourth Report,* conducted by Governor Dewey on June 8 and 9, 1953, developed in fact, as one witness phrased it, that " * * * it is certain and evident that the ILA in this harbor is a racket union * * *. [T]he basic problem on the waterfront is not crime, but how to get a decent labor-management set-up, free of the control of racketeers. The basic problem is not law enforcement, but how to make the waterfront law-enforceable by stripping the racketeers of their false union coloration." *Public Hearings Record, p.* 119. The *Fourth Report* recounts "the exploitation and betrayal of the rank and file dock worker by his ILA officials and representatives," *p.* 19; "It was established that at least 30 per cent of the officials of the ILA longshoremen locals have police records. Waterfront criminals know that the control of the local is a prerequisite to conducting racket operations on the piers. Through their power as union officials, they place their confederates in key positions on the docks, shake down steamship and stevedoring companies by threats of work stoppages, operate the lucrative public loading business, and carry on such activities as pilferage, loansharking and gambling." (*pp.* 23–24) [*Id.* at 120–21.]

*See also In re Application of Waterfront Comm'n,* 32 *N.J.* 323, 331 (1960) (The purpose of the Act was to eliminate evil conditions, primarily the domination of the I.L.A. by criminal

elements, on the waterfront in the Port of New York Harbor.); *N.J.S.A.* 32:23–2 to –4 (Findings and Declarations of the Act).

In accordance with its statutory mandate to eliminate the pervasive involvement of criminals in waterfront activity, the Waterfront Commission established by the Act proceeded to regulate employment practices in the Port of New York. *See, e.g., N.J.S.A.* 32:23–7 and –10(6) to (14). The Act replaced the so-called "shape up" system of hiring longshoremen with the requirement that all longshoremen and port watchmen be hired through employment information centers operated by the Commission. *N.J.S.A.* 32:23–52 and –53. The additional requirements that all longshoremen register with the Commission and that all stevedores [7] and hiring agents be licensed by the Commission were crucial to the disqualification of criminals from waterfront employment. *See Hazelton v. Murray, supra,* 21 *N.J.* at 123; *N.J.S.A.* 32:23–12 to –24, –27 to –38. Under the Act, the Commission could withhold registration from longshoremen convicted of certain crimes or found to constitute a danger to public peace or safety. It could also suspend registration for various offenses. *N.J.S.A.* 32:23–29, –31, and –45 to –51.

As originally enacted, the Act defined longshoreman as follows:

> "Longshoreman" shall mean a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal, either by a carrier of freight by water or by a stevedore
>
> (a) physically to move waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, or
>
> (b) to engage in direct and immediate checking of any such freight or of the custodial accounting therefor or in the recording or tabulation of the hours worked at piers or other waterfront terminals by natural persons employed by carriers of freight by water or stevedores, or

---

[7]Generally, the Act defines "stevedore" as a contractor engaged by a third party to move waterborne freight, or to perform labor and services incidental to the movement of freight, on ships berthed at piers, on the piers themselves, or at other waterfront terminals. *See N.J.S.A.* 32:23–6 and –85(1).

(c) to supervise directly and immediately others who are employed as in subdivision (a) of this definition. [*N.J.S.A.* 32:23-6.]

Experience in administering the statute demonstrated the necessity for broadening the statutory definition in order to sustain the Act's regulatory objectives. As the Commission explained, soon after the passage of the Act

[i]t became apparent that the original legislation contained certain statutory loopholes through which a number of persons with criminal records were able to escape the Commission's licensing jurisdiction. For example, the original Act required the registration of the classic longshoreman who physically handled waterborne cargo on the piers and in the holds of ships but overlooked those who performed tasks incidental, but nevertheless essential, to the smooth flow of the freight. Thus, the Commission found that when it barred a man with a serious criminal record from a longshoreman's job, he would simply move to an "uncovered" job, often at the same pier, to escape jurisdiction. [Waterfront Comm'n of N.Y. Harbor, *Annual Report* 1968–1969, at 11.] [8]

Accordingly, in 1956 and 1957 the Legislatures of New Jersey and New York, respectively, expanded the definition of long-shoreman to include individuals who performed services incidental to the movement of waterborne freight:

"Longshoreman" shall also include a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal, either by a carrier of freight by water or by a stevedore physically to perform labor or services *incidental to the movement of waterborne freight* on vessels berthed at piers, on piers or at other waterfront terminals, including, but not limited to, cargo repairmen, coopers, general maintenance men, mechanical and miscellaneous workers, horse and cattle fitters, grain ceilers and marine carpenters. [*L.* 1956, *c.* 194 § 1 (current version at *N.J.S.A.* 32:23–85(6)); 1957 *N.Y.Laws* 771, c. 188 (emphasis added).]

Subsequent to this expansion of the Commission's jurisdiction there were significant technological developments in the handling of waterborne freight, broadly described as "containerization." Containerization involves the loading of cargo by a

[8]Many undesirable individuals continued to work side by side with registered longshoremen and often handled the same cargo. Indeed, a survey conducted at that time indicated that more than 100 persons whom the Commission had disqualified from registration as longshoremen because of serious criminal records were later employed in waterfront jobs not within the purview of the Act. Waterfront Comm'n of N.Y. Harbor, *Statement in Support of Senate No. 705*, at 2.

shipper into a box-like object called a container. The cargo-laden container is loaded onto a truck frame that transports it to a pier where it is hoisted aboard a ship designed to carry containers. At the port of discharge, the process is simply reversed. Containerization contrasts sharply with the traditional "break-bulk" shipping method, which involved loading trucks item-by-item, emptying them piece-by-piece at the pier, and then loading the ship in the same fashion. Waterfront Comm'n of N.Y. Harbor, *Annual Rpt., supra,* at 11.

One result of containerization was that new contractors and companies appeared on the waterfront and handled cargo in warehouses or consolidating depots located away from the piers. The Commission could not assert jurisdiction over most of these companies and their employees because their work was not performed on behalf of "carriers of freight by water" or "stevedores"—the statutory terms used to define the employers of longshoremen—but rather on behalf of consignors and consignees.[9] As a result, individuals whom the Commission had removed from pier employment because of misconduct were able to return to the waterfront as warehouse employees and work in proximity to the registered longshoremen on the same cargo. Waterfront Comm'n of N.Y. Harbor, *Annual Rpt., supra,* at 12.

---

[9]The original statute and the 1956 and 1957 amendments defined longshoremen by reference to their employers:

> Longshoreman shall mean a natural person * * * who is employed for work at a pier or other waterfront terminal, *either by a carrier of freight by water or by a stevedore* * * *. [*N.J.S.A.* 32:23–6; *L.*1956, *c.* 194, § 1; 1957 *N.Y.Laws* 771 c. 188 (emphasis added).]

The container consolidating companies generally did not meet the statutory definition of a "stevedore" because they were either located more than 1000 yards from the nearest pier or, more often, their services were engaged by an entity, such as a freight forwarder, that was not a carrier of freight by water. Waterfront Comm'n of N.Y., *Containerization Station Survey,* Dec. 13, 1968, reprinted in, Appendix for Defendant-Respondent, App.Div., at Da129–34; *see N.J.S.A.* 32:23–6 (definitions of "stevedore" and "other waterfront terminal"); *L.* 1954, *c.* 14, § 1 (supplementary definition of "stevedore," amended by *L.*1969, *c.* 128, § 1).

To remedy this evident deficiency in the scope of its jurisdiction, the Commission drafted the 1969 amendments to the Act. The Commission viewed the amendments as necessary "to meet the inroad of underworld characters infiltrating waterfront businesses * * *." Waterfront Comm'n of N.Y. Harbor, *Memo. in Support of Senate No. 705*, at 8.

The 1969 amendments were intended to focus on those companies that "stripped" (emptied) and "stuffed" (filled) containers, and those that performed warehousing, carpentry, and maintenance functions integral to the movement of waterborne freight but that operated outside the Commission's jurisdiction and control. Public Hearing, Assembly Labor Relations Comm., N.J. Senate Bills Nos. 705, 706 and 708 (1969), at 4. Similarly, the Statement accompanying the proposed bill indicated that its primary purpose was "to require the licensing and registration of container consolidating companies and their employees * * * and of service companies and warehouse operators and their employees at areas located on the waterfront." Statement, N.J. Senate Bill No. 705, April 10, 1969.

Pursuant to the 1969 amendments, the definition of longshoreman was expanded to include "a natural person * * * who is employed for work at a pier or other waterfront terminal * * * *by any person* to perform labor or services involving, or incidental to, the movement of freight at a waterfront terminal as defined in subdivision (10) of this section [*N.J.S.A.* 32:23–85(10) ]." *L.*1969, *c.* 128, § 1 (codified at *N.J.S.A.* 32:23–85(6)) (emphasis added). Accordingly, the 1969 amendments eliminated from the definition of longshoreman the requirement that a person be employed by a carrier of freight by water or by a stevedore. The amendments also expanded the definition of waterfront terminal to include certain areas located more than 1000 feet from a pier. *Id.* (codified at *N.J.S.A.* 32:23–85(10)). The Commission viewed these amendments as a means of asserting jurisdiction over employees who had been removed from pier employment because of misconduct but who subsequently returned to the waterfront to work on cargo in ware-

houses and consolidating depots. Waterfront Comm'n of N.Y. Harbor, *Annual Rpt.*, *supra*, at 12.

### III

The narrow issue before us is whether certain Mercedes-Benz employees at Building 250 are "longshoremen" or "hiring agents" as those terms are defined in the 1969 amendments to the Waterfront Commission Act. In resolving this issue, our focus must be broad enough to consider the policy of the Act in its entirety, as disclosed by its legislative history. Although individual words and phrases are instructive, they cannot be regarded as controlling:

> We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole act, and that in fulfilling our responsibility in interpreting legislation, "we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy." [*Richards v. United States*, 369 *U.S.* 1, 11, 82 *S.Ct.* 585, 591, 7 *L.Ed.*2d 492, 499 (1962) (footnotes omitted).]

We adhere to the canon of statutory construction that "the general intention of a statute will control the interpretation of its parts." *State v. Bander*, 56 *N.J.* 196, 201 (1970), citing *Denbo v. Moorestown Township*, 23 *N.J.* 476, 481–82 (1957).

Our interpretation of the 1969 amendments is also facilitated by administrative Rulings prepared by the Waterfront Commission to guide its staff in implementing the amendments.[10] The Rulings describe auto preparation as a service "incidental to the movement of freight" and require that employees performing covered services (*e.g.*, auto preparation) at private warehouses in marine terminals be registered with the Commission. Waterfront Comm'n of N.Y. Harbor, "Rulings on the Applicability of the 1969 Legislative Amendments to the

---

[10]The record suggests that the Rulings were never officially adopted by the Commission. Although they were prepared by the Commission directors as a guide for the staff, the Commissioners never took the necessary procedural steps officially to promulgate or adopt the Rulings. The staff, however, appears to have used the Rulings consistently as guidelines for implementing the 1969 amendments.

Waterfront Comm'n Act to Certain Situations," at 1–2. Although this Court is not bound to follow an enforcing agency's construction of a regulatory statute, under these circumstances we accord the Rulings appropriate weight in determining the correct application of the statutory language. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 575 (1978); *see also Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 69–70 (1978).

We also note the Legislature's instruction that we construe the Act liberally in order "to eliminate the evils described therein and to effectuate the purposes thereof." *N.J.S.A.* 32:23–72.

The lower courts concluded, notwithstanding the acknowledged purpose of the statute and its amendments, that the Act did not apply to "the handling * * * by a business of its own goods." We disagree.

■ The 1969 amendments expressly eliminate the nature of the employer as a controlling element in defining "longshoreman," and emphasize the character and location of the work being performed. The amendments deleted the requirement that a "longshoreman" be employed "by a carrier of freight by water or by a stevedore," and substituted the requirement that he be employed "by any person." *N.J.S.A.* 32:23–85(6). The amendments also expanded the definition of "waterfront terminal" to cover areas further from the piers. *N.J.S.A.* 32:23–85(10). Moreover, the purpose of the 1969 amendments is consistent with the overall objective of the Act—the exclusion of corrupting and criminal elements from waterfront employment.

The Mercedes employees over whom the Commission sought to assert jurisdiction were those who performed work that was clearly related to the shipment of the vehicles by ocean carrier. The temporary storage of the vehicles, the removal of the protective coating, the inspection of fluid levels and mechanical and electrical systems, and the repair of any damage from

ocean shipment all constitute services incidental to the movement of freight. That these functions are performed for a private employer on its own vehicles does not assure the exclusion of individuals ineligible for registration as longshoremen who seek work on the waterfront. Building 250's location within the marine terminal in close proximity to the piers lends support to the Commission's concern that an exemption based on the identity of the employer would undermine regulatory efforts focusing on the function of the employees and the location of the workplace.

██ The trial court concluded that the statutory term "freight" should be confined to "goods * * * handled by people as part of a transportation service rendered for pay to other people." Such a restricted definition of freight, emphasizing the custodian of the goods rather than the services performed, is incompatible with the legislative history of the Act and frustrates the objective of the 1969 amendments. As noted, those amendments were intended to continue the expansion of the Commission's jurisdiction in order to ensure the fulfillment of the basic purposes of the Act. Concededly, persons employed by an owner of goods to perform services incidental to the movement of the owner's freight were not specific targets of the 1969 amendments. However, the phrase "employed * * * by any person" contained in the amendments' redefinition of "longshoreman" clearly can include an owner of the goods, such as Mercedes-Benz. More importantly, it can include any employer of persons who perform services in the marine terminal incidental to the movement of freight. The economic function of the employer is of limited relevance. The Commission's jurisdiction must depend upon the function performed by the employee and his relative proximity to the piers if the statutory objective is to be fulfilled.

█ We conclude that those employees of respondent who performed services on vehicles "incidental to their movement" as freight were subject to registration as longshoremen and

that the persons by whom they were selected for employment were subject to licensing as hiring agents. The Waterfront Commission is entitled to recover the assessments that respondent would have been required to pay had its employees been properly registered and licensed.[11] *See Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor,* 486 *F.Supp.* 1110, 1116 (S.D.N.Y.1980). The Commission's right to recover interest and penalties pursuant to *N.J.S.A.* 32:23–74(8) shall be determined by the trial court on remand.

■ We reject the Commission's demand that Mercedes pay a civil penalty of $500 per day for its continuing violation of the Act. *N.J.S.A.* 32:23–89. *N.J.S.A.* 32:23–89 provides that a court's judgment regarding the civil penalty may be for an amount less than that demanded, as justice may require. In the instant case, Mercedes' refusal to comply with the Commission's demand constituted a good faith dispute as to an unresolved question of statutory interpretation. Under the circumstances, it would be unjust and inequitable to permit the Commission to recover a monetary penalty from Mercedes. *See Continental Terminals, Inc., supra,* 486 *F.Supp.* at 1116.

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

---

[11]After the Commission made its initial demands for the registration of Mercedes' employees in 1969, and referred the matter to its litigation department in 1970, the Commission failed to take any action to enforce the statute against Mercedes until 1981. Consequently, the Commission's complaint requested assessments, interest and penalties from March 11, 1981, the date of the Commission's more recent demand.

The Commission acknowledges that the Mercedes payroll assessment must be reduced to reflect the time spent by Mercedes employees testing for and repairing damage or deficiencies not due to marine transportation, or spent repairing vehicles other than the new imports. In view of our holding that the Commission has jurisdiction over the Mercedes employees only to the extent they perform labor incidental to the movement of waterborne freight, on remand the trial court must determine the percentage of each employee's total time that was spent on testing, repairs, and other work that was unrelated to ocean shipment.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance* —None.