13-3903-cv
*Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————

August Term 2014

(Argued:     August 25, 2014         Decided:     April 3, 2015)

Docket No. 13-3903-cv

—————

CONTINENTAL TERMINALS, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

v.

WATERFRONT COMMISSION OF NEW YORK HARBOR,

*Defendant-Counter-Claimant-Appellee.*

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

RAGGI, CHIN, AND CARNEY, *Circuit Judges.*

—————

Appeal from a judgment of the United States District Court for the Southern District of New York (Swain, *J.*), granting summary judgment in favor of the Waterfront Commission of New York Harbor and holding that Continental Terminals, Inc.'s operations at a warehouse in Jersey City, New Jersey fall within its jurisdiction.

AFFIRMED.

_____

RYAN M. FINN, Hacker Murphy, LLP, Albany, NY, *for Plaintiff-Counter-Defendant-Appellant Continental Terminals, Inc.*

PHOEBE S. SORIAL, General Counsel, Waterfront Commission of New York Harbor, New York, NY, *for Defendant-Counter-Claimant-Appellee Waterfront Commission of New York Harbor.*

_____

CHIN, *Circuit Judge*:

In this case, Continental Terminals, Inc. ("Continental") sued the Waterfront Commission of New York Harbor (the "Commission") for a declaratory judgment that its operations at a warehouse in Jersey City, New Jersey were outside the Commission's jurisdiction. Because we conclude that

Continental engages in stevedoring activities at the warehouse and that the warehouse is an "other waterfront terminal" within the meaning of the Waterfront Commission Act (the "Act"), we hold that its operations fall within the jurisdiction of the Commission.

## STATEMENT OF THE CASE

**A.**     *The Commission*

In August 1953, the States of New York and New Jersey entered into an interstate compact, the Act, to address pervasive corruption in New York Harbor. The Act created the Commission to govern operations at the Port of New York-New Jersey. *See Waterfront Comm'n of N.Y. Harbor v. Mercedes-Benz of N.A., Inc.*, 99 N.J. 402, 410 (1985).

When the Act was passed, most of the cargo coming through New York Harbor was handled in the "break-bulk" shipping method. *See id.* at 411-12. Individual pieces of cargo were loaded onto trucks, driven to the pier, and then unloaded. The cargo was then loaded piece-by-piece onto the vessel. Similarly, when cargo arrived in New York Harbor, it was unloaded from vessels piece-by-piece, placed on trucks, and then delivered to another destination. *Id.* at 412.

Containerization transformed the shipping business. With containerization, a shipper loaded cargo into a box-shaped container, typically 20 feet long, 8 feet high, and 8 feet wide, *see In re M/V DG Harmony*, 394 F. Supp. 2d 649, 652 n.3 (S.D.N.Y. 2005), *aff'd in part, vacated in part, and rev'd in part*, 533 F.3d 83 (2d Cir. 2008), which was then loaded onto a truck, *see Waterfront Comm'n of N.Y. Harbor*, 99 N.J. at 411-12. The truck transported the container to the pier, where the container was lifted aboard a ship. *Waterfront Comm'n of N.Y. Harbor*, 99 N.J. at 412. Upon arrival at the final port, the container was removed from the vessel, eventually to be transported to a further destination. *Id.* Container ships are substantial in size and can hold thousands of containers. *See Harmony*, 394 F. Supp. 2d at 652 (describing container ship, which was 176.57 meters long and 27.5 meters wide, and could hold 1,799 containers). *See generally Ne. Marine Terminal Co. v. Caputo,* 432 U.S. 249, 269-79 (1977).

**B.**    *Continental's Warehouse Operations in Jersey City*

Continental operates a number of warehouses in New Jersey, including a warehouse at 112 Port Jersey Boulevard, in Jersey City (the "112 Warehouse"). As part of its operations there, large cranes that sit on

"stringpieces"[1] lift containers of coffee from ships and move them to the Container Yard at the Global Marine Terminal. *See* Complaint, Ex. D. Continental then picks up the containers from the Container Yard and transports them to its facilities, including the 112 Warehouse.

Once the containers arrive at the 112 Warehouse, Continental unloads them and removes their contents. Continental stores the freight for periods ranging from fewer than 30 days to up to 6 months. Continental provides a number of services for its customers, including unloading cargo; sampling and weighing cargo to facilitate sales between its customers (shippers and importers) and buyers; palletizing it; and strapping or wrapping it for future delivery. Continental draws samples from approximately 25% of its cargo and provides weighing services for approximately 10% of its cargo. As of October 2010, Continental transported between approximately 100 and 150 containers a week to its 112 Warehouse.

---

[1]      A "stringpiece" is "the heavy square timber laying along the top of the piles forming a dock front or timber pier." Special App. 4 n.2 (quoting United States Naval Supply Operational Training Center, Shiploading: A Picture-Dictionary of Shiploading Terms (1945)).

**C.**    *The Commission's Determination*

By letter dated April 12, 2011, the Commission advised Continental that it was required to obtain a stevedore license for its operations.  Continental disputed that determination.  By letter dated May 17, 2011, the Commission reiterated its decision that Continental was subject to the Commission's jurisdiction, and that it was required to be licensed as a stevedore.  The letter advised that the Commission concluded that the "property line and building of [the 112 Warehouse]" were within 1,000 yards of a pier.  The Commission advised Continental that its determination was "final" and therefore subject to judicial review.

The Commission identified three pinpoints for determining whether the 112 Warehouse was within 1,000 yards of a pier: (1) the corner of the Global Terminal fence line closest to Continental's facilities; (2) the corner of the Bayonne Tank Ro-Ro Pier closest to Continental's facilities; and (3) the corner of the Bayonne Pier located at the U.S. Coast Pier closest to Continental's facilities.  A survey later revealed that at least two of these pinpoints were within 1,000 yards of the 112 Warehouse.  Continental disputes that these are proper pinpoints.

**D.**     *Procedural History*

Continental commenced this action below on July 14, 2011, seeking

(1) a declaratory judgment that its operations at the 112 Warehouse were outside

the jurisdiction of the Commission and (2) a permanent injunction enjoining the

Commission from requiring Continental to register and obtain a license for those

operations. *Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*, No. 11

Civ. 4869, 2013 WL 5477487, at *1 (S.D.N.Y. Sept. 30, 2013).[2]  The Commission

filed a counterclaim seeking a declaratory judgment that Continental's

warehouse operations fell within its jurisdiction.  The parties cross-moved for

summary judgment.  On September 30, 2013, the district court issued a

memorandum order denying Continental's motion for summary judgment and

granting the Commission's motion.  Judgment was entered accordingly on

September 30, 2013.  This appeal followed.

---

[2]     The district court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 because the case presents a federal question: the Commission is a bi-state agency formed pursuant to a compact between New York and New Jersey authorized by Congress, and interpretation of such a congressionally authorized compact presents a question of federal law.  *See M.F. v. State of N.Y. Executive Dep't Div. of Parole*, 640 F.3d 491, 494 (2d Cir. 2011) (holding that interstate compact approved by Congress "has the force of federal law" and thus its interpretation "clearly presents a federal question"); *see also NYSA-ILA Vacation & Holiday Fund v. Waterfront Comm'n of N.Y Harbor*, 732 F.2d 292, 297 (2d Cir. 1984) ("[T]he Waterfront Commission Compact should be viewed as federal law.").

## DISCUSSION

**A.**     *Applicable Law*

We review the granting of a motion for summary judgment *de novo*.

*Scaria v. Rubin*, 117 F.3d 652, 653 (2d Cir. 1997) (per curiam).[3]

Under the Act, a company engaging in "stevedoring" activities must

be licensed by the Commission and its employees must be registered as

longshoremen.  N.Y. Unconsol. Laws § 9819.   A "stevedore" is defined as:

> a contractor (not including an employee) engaged for
> compensation pursuant to a contract or arrangement
> with a carrier of freight by water, in moving waterborne
> freight carried or consigned for carriage by such carrier
> on vessels of such carrier berthed at piers, on piers at

---

[3]     The district court did not discuss the standard of review to be applied to the judicial review of a determination of the Commission, and it considered the question *de novo*.  On appeal, the Commission suggests that its decision implementing the Act should be afforded "substantial deference."  *See Waterfront Comm'n of N.Y. Harbor v. Constr. & Marine Equip. Co.*, 928 F. Supp. 1388, 1400 (D.N.J. 1996).  In fact, the Commission's decision relies on two subsidiary findings: (1) under the Act, the 112 Warehouse was within 1,000 yards of a "pier"; and (2) under the Commission's own rulings interpreting the Act, Continental was engaged in stevedoring activity at the 112 Warehouse.  The deference accorded to these determinations may vary as a result of their different contexts.  *Compare Belmonte v. Snashall*, 2 N.Y.3d 560, 565-66 (2004) (observing that agency interpretation is entitled to deference if interpretation involves "some type of specialized knowledge," but that no deference is warranted where "the question is one of pure statutory reading and analysis"), *with Building Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507 (2d Cir. 2002) ("We defer to a state agency's interpretation of its own regulations, unless the interpretation is arbitrary or capricious.").  We need not pursue the question further, however, because, even applying *de novo* review to the whole, we conclude that the Commission's determination that Continental is subject to its jurisdiction was correct.

> which such vessels are berthed or *at other waterfront terminals*.

*Id.* § 9806 (emphasis added). This includes contractors who "perform labor or services incidental to the movement of waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, including, but not limited to, cargo storage, cargo repairing, coopering, general maintenance, mechanical and miscellaneous work, horse and cattle fitting, grain ceiling, and marine carpentry." *Id.* § 9905(1)(b). The term also includes contractors who "perform labor or services involving, or incidental to, the movement of freight into or out of containers (which have been or which will be carried by a carrier of freight by water) on vessels berthed at piers, on piers or at other waterfront terminals." *Id.* § 9905(1)(c).

Further guidance is provided by the Commission's Rulings, which define stevedoring activities to include "weighing and scaling," "strapping," and "sampling" at other waterfront terminals. Rulings of the Waterfront Commission of New York Harbor on the Applicability of the 1969 Legislative Amendments to

the Waterfront Commission Act to Certain Situations (the "Rulings") II.A.1,2.[4]

The Rulings also define stevedoring activities to include "load[ing] or

unload[ing] containers with freight which has been . . . carried by a carrier of

freight by water . . . within 1,000 yards of a pier," as well as services performed at

deconsolidation stations, at which a business "receives containers from piers and

---

[4]     The Rulings provide in pertinent part:

A.     <u>Situations Requiring Licensing and/or Registration</u>

1.  Companies engaged in weighing and scaling where the services are performed at piers, vessels or other waterfront terminals are required to be licensed as stevedores and their employees registered.

2.  Companies which provide services such as . . . strapping, . . . crating, labeling, marking, . . . cargo inspection and sampling, etc. . . . [must] be licensed and its employees registered where the services are performed at a pier or marine terminal or other waterfront terminal . . . .

Rulings II.A.1, 2.  Under the Rulings, a company engaging in "regular warehousing" is not required to obtain a stevedore license "even though it may on occasion load or unload containers incidental to its warehouse function, except for operations covered under Paragraph [1.A.3]."  Rulings I.B.1.  Paragraph 1.A.3 provides, in turn, that "[a] warehouse operation by a general stevedore (including loading and unloading of vessels) . . . or a consolidation or deconsolidation station (an operation which moves freight into or out of containers as a regular practice) which is a true extension of the stevedore's . . . or consolidation or deconsolidation station's regular operation and which is performed at a pier or other waterfront terminal requires that the company . . . be licensed as a stevedore and its employees performing the covered work be registered."  Rulings I.A.3.

terminals and strips cargo from said containers for distribution to consignees."

Rulings III.A.1.[5]

      An "other waterfront terminal" is a "warehouse, depot or other

terminal (other than a pier) which is located within one thousand yards of any

---

[5]    The Rulings provide in pertinent part:

    A.    <u>Situations Requiring Licensing and/or Registration</u>

        1.  Contractors who, for compensation pursuant to a contract or arrangement with any person, load or unload containers with freight which has been or will be carried by a carrier of freight by water at a pier or a marine terminal, or within 1,000 yards of a pier (other waterfront terminal), require licensing as stevedores and their employees require registration. . . .  A deconsolidation station is a facility which in the regular course of business receives containers from piers and terminals and strips cargo from said containers for distribution to consignees.  In determining whether . . . deconsolidation is conducted "in the regular course of business" the percentage of such  . . .  stripping as compared to the contractor's other work or services shall not be a factor.

    B.    <u>Situations Which Do Not Requiring Licensing and/or Registration</u>

        1.  The occasional loading or unloading of containers as incidental to the function of a warehouse or other facility which is not primarily in the business of such loading or unloading of containers does not require the licensing of the company performing such work or the registration of its employees.

Rulings III.A., B.

- 11 -

pier in the port of New York district and which is used for waterborne freight in whole or substantial part."  N.Y. Unconsol. Laws § 9806. [6]

**B.**  *Application*

Continental argues that it was not required to be licensed as a stevedore under the Act for its activities at the 112 Warehouse because (1) its "primary function" is "regular warehousing (i.e., issu[ing] warehouse receipts)," and that any stevedoring activity was "incidental to its warehouse function," Appellant's Br. at 31 (quoting Rulings I.B.1), and (2) the 112 Warehouse is not an "other waterfront terminal" because it is not located within 1,000 yards of a "pier."  We disagree, in both respects.

**1.**  *Continental's Activities*

We conclude that the district court correctly held, as a matter of law, that Continental engages in "stevedoring activities."

---

[6]    An "other waterfront terminals" is also defined as "any warehouse, depot or other terminal (other than a pier), whether enclosed or open, which is located in a marine terminal in the port of New York district and any part of which is used by any person to perform labor or services involving, or incidental to, the movement of waterborne freight or freight."  N.Y. Unconsol. Laws § 9905(10).  A "marine terminal" is defined as "an area which includes piers, which is used primarily for the moving, warehousing, distributing or packing of waterborne freight or freight to or from such piers, and which, inclusive of such piers, is under common ownership or control."  *Id.*

Continental provided quintessential stevedoring services under the Act, as it provided services "incidental to the movement of waterborne freight . . . at other waterfront terminals," N.Y. Unconsol. Laws § 9905(1)(b), and provided services "involving, or incidental to, the movement of freight into or out of containers . . . at other waterfront terminals," *id.* § 9905(1)(c). Continental also provided stevedoring services under the Commission's Rulings, which, as discussed above, require licensing and registration for companies and contractors who provide services including cargo storage; weighing, strapping, crating, labeling, marking, inspecting, and sampling cargo; and unloading containers with freight that has been carried by a carrier of freight by water. *See* Rulings II.A.1, 2 & III.A.1. As the undisputed facts show, Continental provided all of these services in connection with containerized cargo removed from ships -- some 100 to 150 containers per week -- at the 112 Warehouse. Continental picked up the cargo from various local steamship piers, took it back to its facilities, stored it, and provided the services identified above.

Continental argues, however, that its primary function is regular warehousing, and that the above-detailed activities were merely "incidental" to its regular warehousing activities. The district court correctly rejected this

argument. *Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*, No. 11 Civ. 4869, 2013 WL 5477487, at *4 (S.D.N.Y. Sept. 30, 2013). Even assuming that Continental's "primary function" is regular warehousing, the level of these other activities engaged in by Continental was more than "incidental." Indeed, Continental's business was to "go to the piers, marine terminals, pick up containerized freight," and then take the cargo back to its facility where it "unload[ed] the cargo, and then . . . palletize[d] . . . [it] and put it into the warehouse and h[e]ld it for the client," providing weighing, strapping, sorting, and other stevedoring services. Joint App. 42. Clearly, unloading containers was more than "incidental" to its warehouse function; indeed, Continental unloaded 100 to 150 containers per week.

## 2. *Other Waterfront Terminals*

The question remains whether Continental's stevedoring activities take place at an "other waterfront terminal." N.Y. Unconsol. Laws § 9806. The 112 Warehouse is an "other waterfront terminal" if it is a "warehouse, depot or other terminal" that "is located within [1,000] yards of any pier . . . and . . . is used for waterborne freight in whole or substantial part." *Id.*

- 14 -

Continental argues that the 112 Warehouse is not within 1,000 yards of a "pier" because a "pier" is limited to structures located on the water that are used for loading and unloading waterborne freight from vessels. Under Continental's definition, a pier does *not* include the area where containers are stored after being removed from a vessel. Thus, according to Continental, the correct measurement should be from the Global Marine Terminal stringpiece that directly abuts the water (the actual structure next to which boats dock) to the corner of the 112 Warehouse, which is 1,119.70 yards. Continental contends that the Container Yard that is part of the Global Marine Terminal should not be included.

The Commission argues that a "pier" is an area where waterborne freight is loaded, unloaded, and stored, including any area where containers are stored once removed from the vessel. The Commission contends that the correct measurement is from the Global Marine Terminal *fence line* (the border of the Container Yard where containers are stored) to the corner of the 112 Warehouse. It is undisputed that the distance from the Global Marine Terminal fence line to the corner of the 112 Warehouse is 521.99 yards.

The district court held that the 112 Warehouse is an "other waterfront terminal" because it is located within 1,000 yards of a "pier." *Continental Terminals, Inc.*, 2013 WL 5477487, at \*4. Specifically, the district court found that the "pier" included the Container Yard within the Global Marine Terminal, and that therefore the correct measurement was from the Global Marine Terminal fence line to the corner of the 112 Warehouse. *Id.* Using that pinpoint, the 112 Warehouse lies within 1,000 yards of a "pier."

We agree. As the district court noted, the definition of "pier" includes a "wharf." *Id.* at \*3 (relying on N.Y. Unconsol. Laws § 9806). While a "wharf" is not defined in section 9806, it is defined in Black's Law Dictionary as a "structure on the margin of navigable waters, alongside of which vessels can be brought for the sake of being conveniently loaded or unloaded, or *a space of ground, artificially prepared, for the reception of merchandise from a ship or vessel*, so as to promote the discharge of such vessel." Black's Law Dictionary 1767 (4th ed. 1951) (emphasis added); *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (holding that "[w]hen a term goes undefined in a statute, we give the term its ordinary meaning," and then consulting "dictionaries in use when Congress enacted [statute in question]" for ordinary meaning); *see also* The Maritime and

Shipping Dictionary 654 (2006 ed.) (defining "wharf" as "[a] structure of open, rather than solid construction, along a shore or bank which provides berthing for ships and which generally provides cargo-handling facilities. A platform alongside navigable water where ships are loaded and unloaded."); Oxford-English Dictionary Vol. XX 185 (2d ed. 1989) (defining "wharf" as "[a] place raised or otherwise marked out on which stuff is deposited for subsequent removal to another place"). Because a "wharf" includes the area where containers are temporarily placed upon discharge while awaiting removal to another location, the Container Yard at the Global Marine Terminal is part of a "pier." Therefore, the Commission correctly used the fence line at the Container Yard as the point of measurement, which is 521.99 yards from the corner of the 112 Warehouse.

In urging otherwise, Continental argues that the Commission's interpretation equates a pier with a marine terminal, rendering the latter term superfluous under the Act. We disagree. A "marine terminal" is statutorily defined as "an area which includes piers, which is used primarily for the moving, warehousing, distributing or packaging of waterborne freight or freight from such piers, and which, inclusive of such piers, is under common ownership or control." N.Y. Unconsol. Laws § 9905(10). Thus, a marine terminal is distinct

- 17 -

from a pier because it consists of a larger area, including piers, which is under common ownership or control. Further, the movement of waterborne freight within a marine terminal is subject to more stringent licensing and registration requirements under the Act. *Compare id.* § 9806 (defining "other waterfront terminal" to include any warehouse located within 1,000 yards of a pier "and which is used for waterborne freight *in whole or substantial part*" (emphasis added)), *with id.* § 9905(10) (defining "other waterfront terminal" to include any warehouse located in a marine terminal and "*any part of which* is used by any person to perform labor or services involving, or incidental to, the movement of waterborne freight" (emphasis added)). Accordingly, we identify no error in the Commission's interpretation.

Our conclusion is consistent with the modern-day realities of the handling of waterborne freight and port operations. Containerized freight is carried in large container ships, large cranes are used, and piers have expanded to accommodate the high volume of containers discharged from vessels. There must be room for "the reception of merchandise," Black's Law Dictionary 1767, and thus there must be storage areas adjacent to the stringpieces to which

containers can be moved and held temporarily until they can be carried away.[7]

These storage areas -- such as the Container Yard at the Global Marine

Terminal -- are an important part of the "pier" as they facilitate the high-volume

discharge of merchandise from container ships. *See Continental Terminals, Inc. v.*

*Waterfront Comm'n of N.Y. Harbor*, 486 F. Supp. 1110, 1115 (S.D.N.Y. 1980)

(holding that Continental's definition of a "pier" as being limited to the

stringpiece is "excessively restrictive"); *Mahoney v. City of Chelsea*, 478 N.E.2d 160,

163 (Mass. App. Ct. 1985) (experts agreeing that "commercial dock" includes "a

storage area to which the cargo can be efficiently moved from the stringpiece and

where it can be  held until it is carried away").  Because the 112 Warehouse is

within 1,000 yards of a "pier," it is an "other waterfront terminal," and

Continental is within the jurisdiction of the Commission.[8]

---

[7]     As the Supreme Court has noted, "[c]ontainerization permits the time-consuming work of stowage and unstowage to be performed on land in the absence of the vessel. The use of containerized ships has reduced the costly time the vessel must be in port and the amount of manpower required to get the cargo onto the vessel.  In effect, the operation of loading and unloading has been moved shoreward; the container is a modern substitute for the hold of the vessel." *Ne. Marine Terminal Co.*, 432 U.S. at 270.

[8]     In light of our conclusion that the Commission's first pinpoint, the fence line at the Container Yard, is within 1,000 yards of the 112 Warehouse, we do not discuss the second and third pinpoints relied upon by the Commission.

*CONCLUSION*

For the foregoing reasons, the judgment of the district court is

AFFIRMED.